# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Raymond P. Moore

Civil Action No. 1:17-cv-1088-RM-STV

Roddy York,

     *Plaintiff*,

     *v.*

BNSF Railway Company,

     *Defendant*.

---

## ORDER

---

This is a toxic tort suit alleging negligence liability under the Federal Employers' Liability Act ("FELA") and failure to maintain adequate conditions pursuant to the Locomotive Inspection Act ("LIA"). In short, Plaintiff York—employed as a conductor/brakeman by Defendant BNSF Railway Company ("BNSF") from 1976 to 1991—alleges on-the-job exposure to various carcinogens, to which he attributes his development of bladder cancer.

Before the Court are Defendant BNSF's *Daubert* motions to exclude testimony by York's causation expert Dr. E. Roy Berger (Berger Motion, ECF Nos. 52, 53) and liability expert Michael Ellenbecker, Sc.D. (Ellenbecker Motion, ECF Nos. 54, 55), to which York responded (Berger Response, ECF Nos. 56, 57; Ellenbecker Response, ECF Nos. 58, 59). BNSF replied to each response. (ECF Nos. 63, 64.)[1] BNSF further filed a motion for summary judgment, arguing in the alternative that (1) without the testimony of his experts, York has failed to mount a

---

[1]    Unless otherwise noted by the Court, citations herein to the *Daubert* motions and responses are to the briefs filed as ECF Nos. 53, 55, 57, 59.

prima facie case; (2) even if their testimony is not excluded, York's claims fail because his experts have not offered evidence on necessary elements; and (3) York filed this case beyond the three-year statute of limitations deadline. (*See generally* SJ Motion, ECF No. 61; *see also* SJ Reply, ECF No. 77.) York responds by (1) agreeing that exclusion of Dr. Berger would be fatal to his case (but maintains exclusion of Ellenbecker is not); (2) arguing that, if included, the expert's testimony would supply the facts necessary to establish his case; and (3) contending that he filed within the limitation period. (*See generally* SJ Response, ECF No. 75.) The parties have requested a hearing on BNSF's motions. (ECF Nos. 60, 65.)

## I.    BACKGROUND

### A.    Development of Cancer

Plaintiff York was a conductor/brakeman with BNSF from 1976 to 1991. (Statement ¶ 4.)[2] He filed this action on May 2, 2014, alleging that occupational exposure to diesel exhaust (benzene) and asbestos during his time with BNSF caused him to develop bladder cancer. (*Id.* ¶¶ 1–3.) Both FELA and LIA violations are alleged as based on York's exposure to these dangerous or hazardous chemicals. (*Id.* at 5–6.)

York developed symptoms of edema of the torso (excess liquid) and sought medical treatment on February 17, 2014, at which time he underwent a series of tests, including urine analysis. (*Id.* ¶ 7.) York returned to the doctor on April 3, 2014. (*Id.* ¶ 8.) At that time, York learned that he had microscopic hematuria. (*Id.*) The doctor "discussed with [York] the finding and significance of hematuria," which included

> GU malignancies, infection, kidney stones, benign tumors, various
> congenital defects, medications such as blood thinners, renal

---

[2]    For ease of reference, all future citations to the Statement of Undisputed Facts will be to the latest SJ Reply version (ECF No. 78-1) and referred to as "Statement," regardless of whether the parties' original citation was to the SJ Motion Statement (ECF No. 62-1) or SJ Opposition Statement (ECF No. 76-1).

diseases, excessive exercise, prostate enlargement urinary tract obstruction, injury, hematospermia, and faux hematuria.

(*Id.*; ECF No. 76-5, at 5.) By then, York was concerned that he had bladder cancer (Statement ¶ 9), but he did not receive a positive diagnosis of the same until May 14, 2014. (*Id.* ¶ 10.)[3]

## B. Expert Testimony

In support of his claims, York disclosed two experts—Dr. Berger, who is offered to provide an opinion on the cause of York's bladder cancer, and Mr. Ellenbecker, who is offered to opine on BNSF's liability. (*Id.* ¶¶ 12–13.) To support his opinion, Dr. Berger performed approximately five hours of research on the effects of diesel exhaust and asbestos. (*Id.* ¶ 14.) On June 28, 2018, Dr. Berger produced a report with his findings based on his review of "medical records on Roddy York . . . [and] the current literature re: workplace health risk to Mr. York." (Berger Report, ECF No. 76-7, at 2.) Based on the sources cited in the bibliography and a recitation of notes from York's medical visits (none of which mention diesel, exhaust, fumes, asbestos, any other carcinogenic chemical, or even suggest that York has ever been in the vicinity of a locomotive, freight car, or related building or facility), Dr. Berger's report concludes:

> York was exposed to diesel fuel, fumes and exhaust from working on and around diesel locomotives on a daily basis. Mr. York was also exposed to creosote from walking on railroad ties while inspecting and making up trains. He was exposed to asbestos located on and in the diesel locomotives and brake shoes on the locomotives and freight cars as well as pipe covering on the steam pipes in the building and facilities.

---

[3] The Statement incorrectly cites this date as May 14, 2015, but the deposition testimony from York on which it is based are clear that the Statement should read: "May 14, 2014."

(*Id.* at 7.) This conclusion was drafted by York's counsel, who supplied it to Dr. Berger for inclusion in his report. (Berger Dep., 76-2, at 17:15–22.) Other than the information quoted above and discussions with counsel, Dr. Berger received no information whatsoever concerning York or his work conditions from any other source. He did not review York's work history documentation; assess chemical testing records; speak with York; analyze worksite conditions at BNSF; read the deposition transcripts of York or any other witness in this case; or interview anyone except York's counsel in forming his opinions. (*Id.* at 17:23–19:12.) Moreover, Dr. Berger does not plan to perform any additional work on this case. (*Id.*) Finally, the report indicates that York's father had colon and bladder cancer, and York smoked from his mid-teens to 2016. (Berger Report at 5.)

At his deposition, Dr. Berger clarified that he was offering causation opinions with respect to diesel exhaust and asbestos only. (Berger Dep. at 20:9–13.) He testified that he reviewed a study concluding that diesel exhaust and asbestos are associated with bladder cancer[4] but added that he had not found a single study concluding that diesel exhaust *causes* bladder cancer. (Statement ¶ 15.) Dr. Berger could not testify to the specific doses of diesel exhaust or asbestos to which York was exposed—if he was exposed at all—while working for BNSF:

> Q: Do you have any reason to believe that Mr. York received exposures to diesel exhaust while inside the locomotive in his job for the railroad?
>
> A: Frequently they don't close the windows to the locomotives especially when they're just sitting there and not moving, but I can't quantitate his exposure.
> . . .

---

[4]   Dr. Berger: "There is an article, A Molecular and Epidemiological Study on Bladder Cancer, which talks about an unexpected association with an odds ratio of 2.8 between definite work related exposure to asbestos and carcinoma of the urinary tract." (Berger Dep. at 66:2–8.)

Q: Did -- did Mr. York work with the windows open or closed --

. . .

A: I don't know.

. . .

Q: -- you can't say, as we sit here today, that under the circumstances alleged by Mr. York that he would have been present to be exposed by the time those particulates fell to a level of exposure of a person; fair?

A: I don't know the answer to that.

Q: Did you attempt to do an analysis of the level of exposure, if any, of Mr. York to asbestos?

A: No. I left that to the attorneys.

Q: So as I understand your testimony today with regard to dose, you have no opinions with regard to the level of exposure of Mr. York to diesel exhaust?

A: Correct.

Q: With regard to dose, I understand that you have no opinions with regard to the level of exposure of Mr. York, if at all, to asbestos while working on the railroad; correct?

A: Well, I -- I know that he was exposed to asbestos because most of the brake shoes or at least I can't believe that if one of those does not contain asbestos that was the only one he was exposed to, so I think he's had some exposure with asbestos. How much, I can't quantitate.

Q: Okay. So the answer to my question was no, you cannot testify how much or the level of dose Mr. York was exposed to with regard to asbestos?

A: Correct.

(*Id.* ¶ 18.) When probed about the methodology he used in determining whether there is a reliable causal connection between a plaintiff's disease and an alleged exposure, he responded, "I look primarily at the literature, if Bradford Hill criteria are there, I use that. If they're not there, basically what the literature says." (Berger Dep. at 28:25–29:5.) While the section of his report

drafted by York's attorneys indicated that he would be opining on diesel exhaust, asbestos, and creosote, Dr. Berger acknowledged during his deposition that he is offering no opinions on creosote. (*Id.* at 20:3–8.)

## II.       SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, a district court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matson v. Burlington N. Santa Fe R.R.*, 240 F.3d 1233, 1235 (10th Cir. 2001). Taking the evidence in the appropriate light, a district court's task is to determine "whether there is a genuine issue for trial[,]" that is, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). When the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). If the movant bears the burden of showing the absence of a genuine issue of material fact, the non-movant may not rest on its pleadings but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Mesa Oil, Inc. v. Ins. Co. of N. Am.*, 123 F.3d 1333, 1336, (10th Cir.1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Summary judgment may be granted after a district court appropriately excludes evidence,

the absence of which leaves a plaintiff without facts to support a prima facie case. *See, e.g.*, *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

## III.   ANALYSIS

FELA and LIA are "remedial and humanitarian" statutes that impose two separate types of liability to protect the safety of railroad employees. *King v. S. Pac. Transp. Co.*, 855 F.2d 1485, 1488 n.1 (10th Cir. 1988). FELA permits railroad workers to recover for injuries caused by the negligence of their employers. *Feichko v. Denver & Rio Grande W. R.R. Co.*, 213 F.3d 586, 591–92 (10th Cir. 2000). LIA, on the other hand, imposes "an absolute duty" on railroad carriers to ensure that their locomotives are both properly maintained and safe to operate. *King*, 855 F.2d at 1488. Because LIA does not create an independent cause of action, such a claim must be brought under FELA. *Feichko*, 213 F.3d at 588 n.4.

The Court finds that (A) the undisputed facts viewed in favor of York show that he timely filed his claims, but (B) his causation expert's opinion is not reliable and must be excluded, and (C) even if that opinion were not excluded, summary judgment would still be appropriate for want of evidence to support specific causation.

### A.  Based on the current record, York filed his claims within the statutory period.

The Court begins by considering whether York filed this case within the permitted statutory period. To maintain a claim under FELA, the plaintiff must allege and prove that the action was filed "within three years from the day the cause of action accrued." 45 U.S.C. § 56; *see also Rohner v. Union Pac. R.R. Co.*, 225 F.2d 272, 274 n.7 (10th Cir. 1955). Thus, because York filed this action on May 2, 2017, the Court's analysis is concerned only with whether the facts—taken in the light most favorable to York—show that York's causes of action had or had not accrued within the prior three years as a matter of law.

FELA does not define when a cause of action accrues. Although it is often clear from the nature of the injury when the statute of limitations starts to run, the accrual issue is "[m]ore problematic [in] cases involving latent injuries which cannot be discovered immediately or those where the injury has an indefinite onset and progresses over many years unnoticed." *Matson*, 240 F.3d at 1235 (internal citations omitted). To avoid the harsh result of strict application of the limitations period in such cases, the Supreme Court has crafted a "discovery rule" for determining when a federal cause of action accrues. *See United States v. Kubrick*, 444 U.S. 111, 121–23 (1979); *Urie v. Thompson*, 337 U.S. 163, 168–71 (1949). Under this rule, a federal "statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994). The parties agree that that "discovery rule" set forth in *Kubrick* and *Urie* applies here, and so does the Court. *See, e.g.*, *Matson*, 240 F.3d at 1235 (in which the Tenth Circuit followed a district court's application of the discovery rule in a latent-injury FELA case).

As to the first part of the rule—existence of the injury itself—a plaintiff's FELA cause of action accrues "only when the accumulated *effects* of the deleterious [condition] manifest themselves." *Robinson v. BNSF Ry. Co.*, 412 F. App'x 113, 116 (10th Cir. 2011) (emphasis supplied) (quoting *Urie v. Thompson*, 337 U.S. 163, 170 (1949)). Manifestation does not mean a plaintiff knows the precise nature or medical origin of the injury. Instead, a plaintiff is "aware of the injury once he or she has been apprised of the general nature of the injury. Lack of knowledge of the injury's permanence, extent, and ramifications does not toll the statute." *Gustavson v. United States*, 655 F.2d 1034, 1036 (10th Cir. 1981); *see also Fries v. Chicago & Nw. Transp. Co.*, 909 F.2d 1092, 1096 (7th Cir. 1990) ("[U]pon experiencing symptoms a

plaintiff has a duty to investigate both the injury and any suspect cause.") (citing *Kubrick*, 444 U.S. at 123). Based on the undisputed facts in this case, York's injury had manifested itself through physical symptoms—effects which he felt and were worrying enough to prompt a visit to the hospital on February 17, 2014. Moreover, by at least April 3, 2014, York's doctor had told him about urine abnormalities and that bladder cancer was a possibility. Even though he had not narrowed down the precise nature or medical origin of it, there is no doubt that York was aware of his injury—and concerned about it—more than three years before he filed suit.

Next, the Court must determine whether, before May 2, 2014, York knew or had reason to know that "his injury is [ ] work related." *Matson*, 240 F.3d at 1236. In *Matson*, the plaintiff worked as a locomotive brakeman from 1974 to 1998 for the same railroad that defends this case, BNSF. There, by April 21, 1995, the plaintiff had twice visited his doctor complaining of significant and increasing back pain, and he and his doctor then discussed "the relation of some of these symptoms or all of these symptoms possibly to some factors of working on the railroad," but the plaintiff received no formal diagnosis of the specific cause. In affirming the district court's finding that the plaintiff's cause of action had arisen, at the very latest, by April 21, 1995, the Tenth Circuit clarified that whether the plaintiff was subjectively aware of the specific causation of his injury is immaterial: By April 21, 1995, he *objectively* "knew or should have known that his employment with BNSF was a *potential cause* of [his] injury. . . . Armed with that knowledge, [the plaintiff] had a duty to exercise reasonable diligence and investigate whether this suspicion was correct." *Id.* (emphasis supplied) (quoting *Fries v. Chicago & Nw. Transp. Co.*, 909 F.2d 1092, 1095 (7th Cir. 1990) ("Moreover, the injured plaintiff need not be certain which cause, if many are possible, is the governing cause but only need know or have reason to know of a potential cause.")).

Of course, whether the cancer is fairly attributable to BNSF would likely be in dispute before the statutory filing deadline, after it, at trial, and through appeal. *See Nemmers v. United States*, 795 F.2d 628, 631 (7th Cir. 1986). Thus, as the above authorities teach, the question is not whether York was certain that his injury came from work, or whether he had a final diagnosis in hand, but whether he was armed with the essential knowledge necessary to investigate his work as a *potential* cause. While this standard sets a low bar, and this case is a close call, there is nothing available on this record that could lead the Court to find that a reasonable person in York's position would have considered his work a potential cause of bladder cancer by May 2, 2014. Though BNSF makes much of the fact that York knew he was exposed to asbestos and diesel exhaust during his tenure with the railroad, such exposure occurred at least thirteen years before the injury manifested itself, and BNSF has not shown how it was reasonable, as a matter of law, for York to make the mental leap from possible exposure in 1991 to cancer in 2014. Unlike the plaintiff in *Matson*, the record here does not reflect that York subjectively considered the railroad to be a cause—a fact which might inform this Court as to what is objectively reasonable. Moreover, the authority BNSF provides from other circuits is factually unhelpful. *See, e.g.*, *White v. Union Pac. R.R. Co.*, 867 F.3d 997, 1002 (8th Cir. 2017) (finding claims time-barred where "[the plaintiff] acknowledges . . . that this pain was connected to irregularities in the railroad track"); *Mix v. Delaware & Hudson Ry. Co.*, 345 F.3d 82, 87 (2d Cir. 2003) (similar conclusion when the plaintiff "testified that at the time he consulted [his doctor], he had 'some belief' that his hearing problems were related to his work"); *Fries*, 909 F.2d at 1094 (7th Cir. 1990) ("The [plaintiffs] indicated, however, that they could not ascribe the hearing loss to a cause other than work.").

Finally, BNSF argues that, despite all of this, York had a duty to discover the cause of his injury with reasonable diligence. While that is a correct statement of the law, the record indicates that York continued to follow up with his doctors and subjected himself to further medical tests and analysis after May 2, 2014 in furtherance of divining the medical cause. Taking the facts in a favorable light, York was not yet armed with what he needed to bring this suit before the deadline. Therefore, at this juncture, the Court cannot grant summary judgment on statute of limitations grounds.

### B. The Court strikes Dr. Berger's testimony as unreliable.

BNSF argues that Dr. Berger's expert testimony should be stricken as unreliable, and York admits that, should the court strike Dr. Berger's testimony, his claims fail for want of evidence of specific causation.[5] Having no direct knowledge of any fact of this case, Dr. Berger is offered as an expert witness and must meet the strictures of Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Similarly, Rule 703 requires the expert to rely on "facts or data," as opposed to subjective impressions. In evaluating expert testimony under these rules, the district court must first decide

---

5    "The Plaintiff will concede that if the Court should preclude the opinion testimony of Dr. Berger as to medical causation then the plaintiff will not be able to prove specific causation." (SJ Response at 3.)

"whether the reasoning or methodology underlying the testimony is scientifically valid." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993)). Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." *Id.* For the purposes of the present inquiry, the Court assumes that Dr. Berger's testimony is relevant and needs only decide whether it is reliable. To this end, the Court's function is that of gatekeeper, which it performs by making specific findings on the record. *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000).

"To be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported speculation.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 590 (1993)). "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell*, 165 F. 3d at 782. Additionally, "[u]nder the regime of *Daubert* . . . a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id.* at 783. Scientific method today is based on generating hypotheses and testing them to see if they can be falsified. *Daubert*, 509 U.S. at 593. As one commentator on *Daubert* put it, "[t]he only essential ingredient for good science—and hence the only overarching method—is that good science must be open to critique and revision. Scientists recognize that what matters most is the explanatory power of the proffered theory and how well the data support the theory.

Erica Beecher-Monas, *The Heuristics of Intellectual Due Process: A Primer for Triers of Science*, 75 N.Y.U. L. Rev. 1563, 1574–75 (2000) (citing *Daubert*, 509 U.S. at 593).

In a toxic tort case, "a plaintiff must prove level of the exposure using techniques subject to objective, independent validation in the scientific community." *Mitchell*, 165 F.3d at 781 (10th Cir. 1999) (citing *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

In *Mitchell*, the Tenth Circuit affirmed summary judgment granted by the district court under facts similar to those presented here. *See generally Mitchell*, 165 F.3d 778. There, a warehouseman and truck driver was tasked with stocking, organizing, and filling orders from the company's "flammable room"—a small space without ventilation and leaky barrels which the plaintiff entered several times daily for meaningful intervals and in which he may have been exposed to several toxic chemicals. *Id.* at 779. After being diagnosed with leukemia and filing suit, the plaintiff sought to introduce the testimony of five experts, including four physicians who examined the plaintiff and material safety data sheets listing the chemicals possibly present in the "flammable room" and one industrial hygienist. The physicians opined that available scientific literature suggested there could be a connection between the leukemia alleged and exposure to a chemical similar to those to which plaintiff was exposed. *Id.* at 782–83. The hygienist studied photographs of the "flammable room" and material safety data sheets listing the chemicals contained in the defendant's products. *Id.* at 779. From those materials and his general knowledge of chemicals, the hygienist pronounced that plaintiff's exposure to the defendant's products probably caused him to develop leukemia—even though the hygienist had never visited the "flammable room" and conducted no air tests to demonstrate the plaintiff's level of exposure to the chemicals. *Id.* In upholding the district court's grant of summary judgment based on the exclusion of the expert testimony, the Tenth Circuit noted that the plaintiffs' experts "appear[ed]

13

to be genuine scientists," but "the analytical gaps in their opinions are too broad for their testimony to endure under the strictures of *Daubert* and Rule 702." *Id.* at 783. To summarize, "[a]lthough the district court, in this case, did not focus on [the plaintiff's] level of exposure to [the d]efendant's chemicals, our review of the record suggests that the information relied upon by [the p]laintiffs' experts with respect to [his] level of exposure was 'so sadly lacking as to be mere guesswork.'" *Id.* at 781 (internal citations omitted).

Here too, the Court finds Dr. Berger's conclusions inherently unreliable—the product of guesswork and assumption—which is not fairly attributable to any scientific data-gathering or methodological analysis. His conclusions are little more than a vehicle for the conclusory suppositions of York's counsel which bypass the scientific method. In his expert report, Dr. Berger made clear that in his five hours of attention to York's case, he did no analysis pertaining to *York* outside a cursory review of York's medical records—which demonstrate, at best, only that York had bladder cancer. Those records have nothing to do with York's presence anywhere near a railroad or that such presence resulted in injury. York was not personally tested or physically examined in any way. There is no recount of his work routine or how that routine personally affected his health. Neither did Dr. Berger collect or review data reflecting the conditions *at BNSF*. The hallmark of the scientific method is testability of data for critique and revision by peers. How could any scientific peer examine or reproduce Dr. Berger's results when Dr. Berger himself admits that he can offer no exposure-level opinions of any kind specific to York? As the report stands, Dr. Berger could swap out York's name for that of any other ex-railroad employee with bladder cancer and the information contained therein would be functionally identical and equally inoperative as to specific causation. Dr. Berger's failure to base his conclusions on York-specific data is reason enough to exclude him.

Additionally, BNSF argues that Dr. Berger failed to employ any reliable scientific methodology—more specifically pursuant to the "Bradford Hill" criteria model for establishing causal connection based on epidemiology. (Berger Motion at 10–12.) While the Court finds those criteria helpful in analyzing causation, it declines to announce a rule that all causation experts in all toxic tort cases must invoke that test. But more importantly here, the Court finds that Dr. Berger did not employ *any* methodology, let alone the Bradford Hill criteria. The work Dr. Berger performed—reading a list of available literature and concluding that York developed bladder cancer based on counsel's representation that York was a railroad employee—is not a reliable procedure subject to scientific scrutiny, but a merely a means to affirm a pre-determined conclusion. "[S]cientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests [may] properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method." *Mitchell*, 165 F.3d at 783 (internal citation omitted). For this additional reason, the Court finds that Dr. Berger's testimony should be excluded.

### C. Even if the Court found his testimony admissible, Dr. Berger has not provided facts sufficient for York to prove specific causation.

Proving causation is necessary to advance an action under both FELA and LIA. *See Straub v. BNSF Ry. Co.*, 909 F.3d 1280, 1283–84 (10th Cir. 2018) (characterizing LIA as a supplement to FELA, and finding an LIA violation substitutes for "negligence" in 45 U.S.C. § 51 and creates strict liability, but not dispensing with the causation requirement). Even though the Supreme Court had stated that FELA's causation language "is as broad as can be framed," *Urie*, 337 U.S. at 181, the parties readily agree that under the current circumstances—alleged toxic tort—a plaintiff must advance facts, via expert testimony, to show both general and specific causation. *See Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 642 (7th Cir. 2010) (clarifying that

when the injuries are not attributable to specific moment but "are the product of years of working on the railroad[,] . . . determining what caused it is not usually obvious to a layman and thus requires expert testimony"). "General causation is whether a substance is capable of causing a particular injury or condition in the general population and specific causation is whether a substance caused a particular individual's injury." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005).

Thus, to avoid summary judgment, York must show facts that, taken in the most favorable light, demonstrate *both* that diesel exhaust or asbestos (1) is capable of causing bladder cancer and (2) did in fact cause *his* bladder cancer. Moreover, a "plaintiff must first demonstrate general causation because without general causation, there can be no specific causation." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005). As to specific causation, in a toxic tort case, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden." *Mitchell*, 165 F.3d at 781 (internal quotation omitted).

First, as Dr. Berger admitted, there is no way to tell from the literature provided what, if any, level of exposure to the chemicals at issue induces bladder cancer (general causation). Second, there are no facts that could support a finding of specific causation. As demonstrated above, there is no data from which a reasonable fact-finder could scrutinize injury specific to York, as opposed to any employee, working in any capacity, under any conditions, for any railroad (or other enterprise, for that matter). In short, there is no information showing what level of exposure to dangerous chemicals, if at all, York personally experienced. Without such information, no findings of fact could be tethered by reason to reality, and BNSF is entitled to judgment as a matter of law.

**IV. CONCLUSION**

The Court finds that the filed materials provide sufficient information to resolve these matters. Therefore,

    1) The unopposed request for a hearing (ECF No. 60) is **DENIED**;

    2) The Berger Motion (ECF No. 52) is **GRANTED**;

    3) The SJ Motion (ECF No. 61) is **GRANTED**;

    3) The Ellenbecker Motion (ECF No. 54) is **DENIED AS MOOT**.

York's Complaint is **DISMISSED** with prejudice. The Clerk shall enter judgment as set forth herein in favor of BNSF Railway Company and close this case.

DATED this 21st day of February, 2019.

                          BY THE COURT:

                          _____

                          RAYMOND P. MOORE
                          United States District Judge